Argument not to exceed 15 minutes per side. Mr. Gulley for the appellant. May it please the court. My name is Gerald Gulley of the Knoxville, Tennessee Bar. I am the appointed counsel on appeal for Mr. Darren Wesley Huff, who was convicted in the United States Court for the Eastern District of Tennessee  to go to a superseding indictment with a violation of Title 18 United States Code Section 231A2, which charged him with transporting in commerce a firearm, knowing and having reason to know and intending that such a firearm would be used unlawfully in furtherance of the civil disorder. I have already reserved rebuttal time for Congressman. As I said, this case arose based on conduct that occurred in April of 2010. Mr. Huff is a resident of Georgia, and in April of that year, he entered into a bank in his hometown and made some boastful statements to bank personnel about he and some friends who were going to go up to Madisonville, Tennessee in Monroe County from Georgia and engage in some activities on behalf of a friend or an acquaintance of his named Walter Fitzpatrick. The nature of the statements, I guess, led the bank employees to contact law enforcement, and on the night before Mr. Huff had planned to travel to Tennessee from Georgia, he was visited by a special agent of the FBI, Special Agent Reed, and Agent Reed had a conversation with Mr. Huff about his planned activities, and they, as I said, had had a conversation about that, and Mr. Huff on several occasions said, you know, look, if you think this is a bad idea, I mean, call your supervisor, tell him. You know, it won't be a problem. You know, I won't go. I won't do anything. He also, either in that conversation or the next day during his travel up to Monroe County, Tennessee, he invited law enforcement agents to come with him. He said, we want you on our side. We want you to come along. He also said if things went south that he'd be happy to shoot him. Well, he did say that he would resort to violence if provoked, if provoked. Let me ask you this. Yes, sir. I think we've all seen the video tape, and the rolling through the stop sign is, well, it is what it is. But could law enforcement just use the traffic stop as pretext? I mean, aren't they allowed to do that? I mean, it's probably possible. Well, I don't think that you can use a traffic stop, you know, for a pretextual reason. You know, certainly we suggest that, you know, as you said, the video is what it is, but that the actions of Mr. Huff in operating his vehicle on that day, you know, did not give sufficient rise to a violation under Tennessee law. The agent, the officer who stopped Mr. Huff basically said that, you know, there's nothing in the Tennessee code about how long you have to stop, you know, at a stop sign, you know, or the distance between following, between vehicles, you know, to be too close to following. So I respectfully suggest that there was not a sufficiently objective indicia, you know, a violation of law that would have supported a traffic stop. Well, there were two basics, the following too closely. Yes, Your Honor. And the not stopping at the white line. Sort of a rolling, rolling stop. So why isn't there at least enough to allow the officer to believe that he had property of cause or to have an objective belief? Well, you know, again, you know, the Sixth Circuit in the United States case law, United States v. Succo says that the conclusions about the violation of law have to be based on an objective justification. There was nothing about Mr. Huff's conduct which really suggested, except based upon the subjective belief of the officer, that he was following too closely. Again, there was nothing in the applicable Tennessee rules of the road, under Title 55, Chapter 8 of the Tennessee code, you know, which mandates, you know, a certain distance between one vehicle following another. There's also nothing in the rules of the road. So are you saying then that if the state has a law that says you should not follow too closely, that there would be no officer who could stop anyone and give them a ticket for following too closely because they've been limited to a certain number of feet? Well, that's not necessarily what I'm suggesting, Your Honor. I'm saying that basically there is nothing that expressly sets forth, you know, what is too close or not. It's sort of something that's inherently subjective. So officers have to use a reasonable person's judgment or a reasonable officer's judgment as to whether or not to stop somebody. Well, that gets into, you know, a whole lot of latitude. Typically, I mean, in my experience, you know, these questions about following too closely or violations come up when there's already an accident. You know, somebody has rear-ended somebody else, and you get the police report, and, you know, the officer writes, you know, they're charged with following too closely because they were not able to stop in sufficient time. So I just suggest to the court that there is too much window for subjective evaluation and insufficient basis for objective determination by the officer, you know, in a case like this. Counsel, let me ask you about, though, the importance of a stop, and the sense that what all the stop pretty much does is get into evidence of conversation that was held with the officer, that is, you know, he had guns, he had the other elements. To me, with Buck where you were going, the key question is, when he crossed the line, what was his intent? And my question to you is, isn't that a quintessential jury question? You've got some things that are bad for him, based on what he said in the bank. You've got some things that might be good for him, as you just said, from the FBI agent. You've got what happened in Tennessee. So that even if the stop was bad, even what happened at the stop was testified to. But again, you were just saying some is good, some is bad. So out of all of this, how do you get away from just saying that the intent was a quintessential jury? Well, because I think if you subtract the conversations, you know, and the physical evidence, you know, from that stop, from the totality of what the jury had to consider, you know, then I guess we're… What physical evidence? I mean, he said in Madisonville he had guns. He said in Georgia he's going to take guns. So the fact that he put the .45 in the toolbox at the stop adds almost nothing to the transport. It may not, Your Honor. It may not. You know, although certainly, as I've said, it sort of goes into the larger picture, you know, of whether, you know, there would be, subtracting all of this, sufficient evidence to convict him on count one. Yes, there was testimony of a law enforcement officer in Madisonville that he saw Mr. Huff take a pistol, you know, out of the toolbox of his truck and, I guess, go into the restaurant where another law enforcement agent said that he was providing a motivational speech, you know, to sympathetic persons. You know, I think it makes it a lot… Couldn't that be called inciting a riot, basically? I think they were going to take over the courthouse if they had more people. No. With all due respect, Your Honor, I mean, you know, if there was that kind of incitement, certainly I think you would have expected the law enforcement officer, you know, to say something along the lines of he was in there telling them, I'm leading the charge, you all are following, we're going to storm the courthouse, and we're going to gun down whoever was in our way. That was maybe the testimony. I mean, he described it as a motivational speech, a pep talk. He took a head count, figured out a number, and said, let's go home. Well, you know, we can speculate about a number of things. But the crime, I mean, in either direction, the crime isn't what he said in Madisonville. The crime is crossing the state line with the intent. So to me, at least, he clearly crossed the state line. He clearly had firearms. The question is, what did he intend to do when he was doing that? Well, and that's why I come back to wasn't there enough evidence for the jury to decide one way or the other? You may have had a pretty good argument. I'm not saying one way or the other, but the jury, he says, you know, we're going to take over the courthouse. He said at some point that we're going to do things if there's enough. Now, does the subjunctiveness help you? It helps you with the jury. Well, certainly they did. In fact, I'm going to ask your colleague, but I doubt that he's going to say that the motivational speech is really any part of the crime. We'll see. Well, I mean, certainly, I guess, to the extent that the government is saying that it was part of the incitement, you know, or the civil disobedience. You know, so other than that. Civil disorder, I misspoke. You're correct. I mean, because this whole statute was passed in the wake of the 1968 urban riots, right? So I don't know exactly when it was passed, Your Honor, but, you know, it certainly talks about, you know, three or more persons gathering and acts of violence and so forth. I guess Section 231.1 just defines that. So at any rate, Your Honor, I guess I would like to segue, if I may, into the second argument that I raised, which dealt with, you know, the fact that the court did not have jurisdiction in a traveling under the Commerce Clause, Article I, Section 8 of the United States Constitution, which provides that Congress has power to regulate commerce among several states. Now, I guess my argument basically goes to the gist of the fact that the activity engaged in was not a commercial enterprise. And there has been many, many cases, I think outside of the National Federation, the challenge to the Affordable Care Act, you know, as talking about that and defining, you know, the fact that commerce under the Commerce Clause, you know, relates to the existence of commercial activity. This was not a case where there was commercial activity involved. I mean, you had Mr. Huff, who had a valid handgun permit, you know, taking a handgun across state line, I guess supposedly, you know, but it's not commercial activity that is understood by the Supreme Court or by the other courts. Would your position require us to invalidate our prior precedence in gun-carrying offenses? Which precedence is your honor? I'm just asking generally whether you thought through whether your position would require us to invalidate our prior precedence. No, your honor. I think it would affect basically this particular statute. The transportation in commerce, you know, of firearms to effect civil disorder across state lines, because that is simply not the kind of commercial activity or economic enterprise that is – your honor, I see that my time has expired. Let me finish my – that's simply not the kind of activity that is contemplated within the purview of the Commerce Clause. Because of that, there is not a jurisdiction, you know, to prosecute Mr. Huff. Thank you, counsel. Yes, thank you, your honor. Thank you very much. We'll have your remaining time for rebuttal. Thank you, your honor. Good morning. May it please the Court. My name is Luke McLaurin, and I'm here on behalf of the United States. On April 20th of 2010, the defendant left his home in Georgia, went to Madisonville, Tennessee with multiple firearms, over several hundred rounds of ammunition, and he went there for the explicit purpose of, in his own words, taking over the courthouse. And he was going to do that by conducting citizen's arrests of court officials and law enforcement personnel. Because that activity violated Section 231A2 of Title 18 of the United States Code, and because the defendant has failed to meet his burden of showing that that statute is, in fact, unconstitutional, the United States requests that this Court affirm his conviction and his resulting sentence. Now, Judge Wald, you mentioned during the counsel's time you had a question about what this statute prohibits and whether the motivational speech was part of it. And I want to get right to that. It's our position that this crime was completed once he crossed state lines with the firearms with the requisite intent. Now, this information about this motivational speech, all this information that came out at trial, was all relevant for the jury's determination of whether he had the requisite intent at the time that he transported the firearms. So he could have been arrested when he crossed the state line because he hadn't expressed the intent already in person. Is that right? Yes, he could have been arrested after he crossed the state line. Now, the counsel seems to make a big deal of the fact that, well, he wasn't arrested when he was pulled over in the traffic stop. And when the FBI came to his house the day before, or excuse me, the few days before, they didn't tell him, oh, hey, wait, don't go. Stop. Don't do this. But that suggests that there's somehow some duty on law enforcement to stop a crime as soon as they have reason to believe that the crime has been committed. It is a little odd, or I wonder. The people who stopped him at the traffic stop, they knew what was going down in Madisonville. They knew there were 100 law enforcement officers there. And have any argument one way or the other about why they said, oh, OK, you know, keep your 45, your AK-47 and get off to Madisonville? Well, I can't speak as to what specifically was going through the officer's mind at the time. But I would say I make two points in response to that, Judge Cox. First, there is no legal obligation for them to have arrested him at that point. But secondly, there might be some legitimate law enforcement motives here. I mean, for example, at that point, there was indication that there were multiple groups, that there were multiple people that were going to be converging on this courthouse. The law enforcement officer didn't have a complete picture of the situation. And it was reasonable for them to perhaps wait and see, hey, you know, who all is involved in this? What is the threat? Let me ask you, compare this to the paradigmatic cases back in the 60s, especially Brandenburg and Goss. Granted, those were different statutes. But basically, if you weren't inciting imminent lawless action, right? In one case, the guy says lots of terrible things, but he doesn't do anything then. The other one, the guy says, we'll take the streets later, which almost exactly echoes, well, if we had more people, we'd take over the courthouse. So I'm asking you, in light of those precedents, isn't there some problem with the kind of ambiguity here? They call it boastful statements, that if he simply says, you know, down with the government, and we're going to take the government down, you make up any set of language. Is that all within the purview of the jury, or is there some First Amendment protection here that we at least ought to be concerned about? Well, I don't think that the First— Do you agree that simply carrying the guns—in fact, the interesting example would be, suppose he makes exactly Brandenburg's speech. He carries the gun across the room with a picture of the Minuteman with the gun in the air. He's not going to use it. It's a prop in making a speech. And he makes exactly the words that Brandenburg does or that Goss does. Could he still be convicted? Yes, because this statute is not targeted at speech. Unlike in the Brandenburg case and the Goss case, that those statutes were targeted at prohibiting individuals from saying certain things. This statute is not targeted at speech at all. It's targeted at conduct that involves transporting a firearm to— Conduct is that, but if anything, it's not even the speech. It's the law, right? Because he doesn't have to say anything as long as he has the intent. But the intent here is unconnected with any sort of message that he might want to convey. And I think that the Supreme Court's jurisprudence is pretty clear that violence is not a First Amendment protected activity. That engaging in acts of violence against other individuals, that's not speech. That's not something that's protected. So the question is the line between talking about violence, which they did in Brandenburg and Goss, and intending violence. Although here, of course, no violence occurred. Am I right that the underlying civil order has to be attempted assault? They never assaulted anybody. No, and the reason they probably didn't is because there was an overwhelming line between— I understand that, but that you can even— Did you prove that assault was what they intended as opposed to attempted assault? For example, because they never said we're going to beat somebody up. They said we're going to arrest them. Well, that might involve violence. It might not. And I think that if you look at the Tennessee Aggravated Assault Statute, it talks about— Aggravated assault can occur with sort of physical action, but it can also occur when you reasonably place somebody in apprehension. And I think if you're going to conduct a quote-unquote citizen's arrest that has no justification in law and you have firearms with you, that's going to place an arrested person in fear. So the sort of tightest part would be to say that they intended to affect a citizen's arrest. The citizen's arrest would have to put the arrestee in reasonable fear of violence because otherwise it's not going to be arrested. If you say, come with me, even if you don't touch him, he's not going to come unless you have the guns. Absolutely, Judge. That would be the narrowest thing. But is that intended or attempted assault? Is there a difference? Well, I agree with you. I agree, Judge Moore. In this case, I think what we have is a lot of evidence that he intended to commit an assault. And I think that one could argue that he took some overt acts in furtherance of that by going to the courthouse, going to the place where he was planning to conduct this assault. But I agree that that is a somewhat difficult question on the facts of this case. But the statute here is not prohibiting assault. And I also want to clarify, it's not prohibiting having bad thoughts. What it's prohibiting is carrying a firearm with the intention that it's going to be used in this unlawful manner, in this manner that is likely to create violence and cause a disturbance. So all that you are asserting is that there was intended violence, intended assault, not attempted? Yes, and I think that the importance of – well, I would argue that you could make the argument that there was an attempt. Just by bringing the gun there and having it needed? I agree that it's more tenuous. Yes, I think you could argue that baseline. You could argue there was an attempt. How would you argue there was an attempt? I would argue that by bringing the gun there, by sort of taking these overt acts, these steps toward going toward the law enforcement officials, that that might constitute an attempt. Walking toward the officials? Is that what you're saying? Perhaps. I think it would be a much more tenuous argument. I don't need to make that argument. I'm not necessarily making that argument. I'm just saying one particular argument in this case. I agree with you, Judge Moore, that there are certainly problems with that argument. But I think the key point here is that all this discussion of whether violence was intended, this is trying to get at the statutory definition. If you look at what he was convicted of, we had to show that he intended to use this in furtherance of a civil disorder. And a civil disorder is a public disturbance involving acts of violence by assemblages of three or more people. Actual violence is the assault, isn't it? Yes. I mean, that's where you circle back. You used two different phrases. I want to distinguish. You used overt act, which I think of as a conspiracy. And then you used significant step, which I thought was the attempt. Yes. And at least maybe your case is stronger than you say. If I leave the house with a gun intending to rob a bank and I slip and fall and break my leg, you could usually be arrested for attempted bank robbery because that was a significant step. At least that's where the argument comes in. I thought that was where you were going to go because I'm more dubious that he intended to commit the assault because he said if things go badly, this will happen. Are you saying that you have to rely on he intended to commit the citizen's arrest? The citizen's arrest was inherently an act of violence. Is that like the narrow decision tree here? I believe so, and I think there is evidence to suggest that he did intend to commit citizen's arrest. And it's not – It's kind of a strange statute, though, because the assault, it does have an intent section, but it only deals with strangulation. Not the other – I thought it was a little strange just the way it's worded and getting back to Judge Moore's question about intent versus attempt. It could be problematic, but I don't know. Because of the way the statute is written, it clearly says there has to be an attempt. I guess I'm confused as to the question, Judge Barrett. Could you clarify for us? Well, the statute itself talks about you run an aggravated assault, and then it has a specific intent section for strangulation, which is not what we've got going on here. So it seems like, getting back to Judge Moore's question, are you prosecuting this guy for intent or an attempt to commit an assault? Well, he's not being prosecuted for either. He's not being prosecuted under that, the aggravated assault statute. Getting back to Judge Boggs, though, you fall back on the assault statute, your comfort zone. Well, I think that it's not just the assault statute. I think that, I mean – and it's not – I don't think we necessarily – I do think there is evidence to show that he intended to commit these citizen's arrests. But I think that the point is, did he intend to bring this firearm to a public disturbance that might – that would involve acts of violence? And I think that it's clear that he intended to go to this courthouse, and he intended to be joined by all these other members of these various militia groups, and that they intended to create a disturbance of some sort. And given their discussion about taking over the city, about there being a front line, that that disturbance could have involved acts of violence.  It doesn't have to just involve acts of violence, does it? Doesn't the statute require that you have reason to know or intend that the firearm will be used unlawfully in the presence of a civil disorder? So, intending that – I'm putting the word firearm – will be used unlawfully. So if there's violence at the civil disorder, and he's not using the firearm in that – or intending to use the firearm in that, then he doesn't seem to be violating the statute. Well, I don't think he has to intend himself to use the firearm, the way the statute's written. It says that knowing or having reason to know or intending that the firearm will be used unlawfully, which suggests that another individual, he could be transporting the firearm to give to somebody. Somebody else. Yes. And if he has reason to believe or he intends that that person is going to be using that firearm in furtherance of a civil disorder. Was there any evidence introduced at trial that he was intending somebody else use the firearm? I don't believe – no, no. The evidence at trial in this case suggested that he himself was intending to use these firearms. I think the jury could reasonably infer that he might have also intended for other people to use the firearms, given that he brought multiple firearms. And given that he was going to be a group of people, given the number of rounds of ammunition that he brought with him, I think the jury could make all those reasonable inferences. How do you know he brought them all? I mean, nobody ever searched the truck for the second weapon. Speaking of the speech, he said, did he say that I got 300, 400 rounds of ammunition? Yes. I mean, he said that himself. He said that one – from one firearm, right? You can have multiple rounds for one firearm. It's certainly possible that you can have multiple rounds for one firearm. He described himself as having multiple firearms. He described himself as having a Colt .45, which he showed the officers his honest head. He also said he had two AK-47s. If I could sort of switch for a second. Suppose we thought to stop the – which was asserted because he was following too closely and because he was asserted to be not stopping at the appropriate place at the appropriate length of time. Suppose we thought that that was not a valid stop. If you're looking at the video, we thought this was ridiculous to stop him. Does your case fall apart? I don't believe so because I think that there's sufficient other evidence to sustain the conviction. So we just ignore – on my hypo, we would ignore the fact that there was an illegal stop on my hypo. And evidence from that stop wasn't produced at his trial. Well, I think it's actually a debatable point, which was never actually argued in the court below because of the nature of the district court's rulings, that the evidence that was used against him at trial, the most powerful evidence, was that actually obtained from the stop. If you look at the facts in the direction very carefully, what happened is he was – there was this traffic stop. He was issued the warning citations. And the officers were ready to go. They wanted to leave. He then, after the stop is fully complete, he then himself volunteers this information to the officers. He says, wait a minute. I want to pre-warn you that we're going to Madisonville here. We're going to take back the city. I've got my Colt 45 here. There ain't no government official. We're going to go peacefully. So all the prejudicial evidence you're saying came after this stop was completed? And I think there's a really strong argument that, again, it was not made to the district court below because of the nature of the district court's rulings. But there's a clear argument that this – that all this evidence was obtained – is not a result of the stop itself. It was obtained – But what happened after the stop? To some extent, yes, that's true. I mean, you wouldn't have talked to the officers. But this – I mean, I think you – you know, was this evidence obtained as a result of a particular Fourth Amendment violation? I think that would be relevant to the analysis that this court would have to conduct under hearing to determine whether – suppression would be appropriate. You said we would have to consider under – did you say under a hearing? I'm sorry, under hearing. Hearing. Under hearing. Even if this court were to find that a Fourth Amendment violation occurred, it would then have to ask the question of, is suppression an appropriate remedy in this case? And I think given the evidence in the record here, in briefly responding to the parents' concern, there in fact is no evidence of pretext. The officer who did this stop really had no idea who Huff was when he stopped him. He had no clue that he was going to find somebody connected with this disturbance. He just – it's all – Well, he didn't like the writing on the truck, right? Well, the writing on the – He didn't believe that his reason for picking up his truck to stop him. It's actually – the record's pretty clear that that was not the reason why he stopped the truck. He certainly noticed it when he saw the truck, but he was right behind the truck when he observed these traffic violations. There was some indication that he knew that something was going on in Madison. Yes, there is. And, in fact – And that people might be coming from Georgia, and if there is a Tennessee-Georgia line. He knew that, but he actually explicitly testified at both a suppression hearing and a trial that he did not suspect that this vehicle was part of that group. That he – in fact, he didn't know at that point when he pulled over the vehicle that Oath Keepers had anything to do with this group. He found that out later. So, I think given all of those facts, even if the court were to find a Fourth Amendment violation, suppression would be an inappropriate remedy in this case. Could I ask you one question? As it relates to this guy, how do you get the enhancement for more than minimal planning? And where does the line to law enforcement come from? Because it seemed to me it was pretty straight up in all those conversations. There's enhancements for both of those. For more than minimal planning? Yeah. Well, I think that when you look at the – It's not a conspiracy, right? It's not a conspiracy. The charge is a conspiracy. This guy sees a boulder or something and he crosses the state line. He gets more than minimal planning enhancement. Well, I think if you look at all the evidence in the record, there was testimony that he had been planning this takeover of the courthouse for weeks. That he had gone up to Madison Building, consulted with Fitzpatrick. He'd sent text messages back saying, no, we didn't conduct citizen's rest today. He's coordinating with a bunch of other individuals. I think given all of that evidence that's in the record of this concerted activity over several weeks, trying to put this plan in together, I think the district court could reasonably conclude that it was a higher incentive and showed that there was more than minimal planning. Any other questions? Thank you, counsel. Welding, you have your remaining time for rebuttal. Yes, Your Honor. Thank you. With respect to the question to Mr. McLaurin about the knowledge of Trooper Wilson who made the stop of Mr. Huff that was challenged, I think if the court does look at the transcripts of the suppression hearing, he does state that, you know, we had all been part of the briefing. We were told that there were people from surrounding counties as well as the state of Georgia who might be coming up here. He said his attention was drawn to the black GMC pickup truck, the large riding home truck, bumper stickers, you know, and the Georgia Tech. So, you know, clearly he was on the lookout for that. I think that under Wong's son, certainly any statements that he made, you know, from the point onward that he was stopped, you know, would be subject to suppression. So notwithstanding counsel's argument that to the contrary, I think, you know, everything from that point on would be omitted. I guess the language of the statute transporting in commerce a firearm, knowing and having reason to know, and intending that such firearms would be used unlawfully to further its civil disorder, I don't think the proof supports, you know, the conviction under this and that there was insufficient evidence. Certainly with respect, again, as we suggested that this was done as a commercial activity or for economic purpose, but also the knowing and intending that such firearms would be used unlawfully. I mean, he testified, he said, you know, I've got my firearm. I've got a lawful handgun carry permit from the state of Georgia. You know, that is not unlawful. I mean, he could walk around with it all day, you know, so long as he has the valid handgun carry permit. You know, I don't think that there was sufficient proof that he was going to purposely use that in furtherance, you know, of any sort of civil disorder. I mean, certainly there was no testimony, you know, that he did anything with the firearm in furtherance of any civil disorder. You know, the worst that could be said is that there was a testimony of the officer that, you know, I saw him get the handgun, you know, out of the truck and go back in. And he could go in or go back into the restaurant where he was giving the motivational pep talk speech to those who, I guess, were sympathetic to him. All right, let's distinguish here. Distinguish for me the facts versus the law. That is, this statute, if the person intends to go down and help a riot occur, the fact that the gun is lawful and the fact that he doesn't subsequently do it doesn't get you out from under the statute. So is the statute bad, or are you just saying the evidence that this guy intended anything is not enough? Both. I'm saying the statute is bad relating to the Commerce Clause argument that I made, but I'm also saying that, you know, in terms of, you know, proof that he intended to use it in furtherance, as opposed to just having it on his person. And use it unlawfully. And use it unlawfully. So, you know, having it on his person is a lawful use of it, you know, under the terms of a jury permit. So I see that my time is up, Your Honors. Any other questions? Thank you, Mr. Geller. We appreciate your taking this case for the Criminal Justice Act as a service to our system of justice.  The case will be submitted.